## John McDonogh v. Auguste Delassus and another.

Where an agent of a third person, believing himself authorized as such to sell certain property of his principal, receives from a purchaser, who also believed that he was authorized to sell, a part of the price, which was paid over to the principal, the purchaser, on discovering the want of authority in the vendor, may recover from the principal the amount so received by him, and this, though a balance may be still due by the agent to the principal, after crediting the former with the amount paid over by him. Art. 2134 of the Civil Code does not apply to such a case.

An agent is bound to deliver to his principal whatever he has received by virtue of his procuration, though unduly. C. C. 2974.

The relation of principal and agent is not that of debtor and creditor from the moment that the agent receives money or property for the principal. It is a trust; and does not give the agent any title to the money or property so received, which would be the case if he were regarded as a debtor. The agent may become a debtor of the principal, but not until the dissolution of the contract of agency, and his neglect or refusal to account and deliver over the funds or property. While the agency continues, the property or money in the hands of the agent belongs to the principal, the agent being a mere trustee.

Appeal from the District Court of the First District, *Buchanan*, J.

*Roselius*, for the appellant.

*L. Janin*, contrâ.

Garland, J. The plaintiff claims as against Auguste Delassus, one of the defendants in the court below, but against whom no judgment has been rendered, and who is not before us, that he

be decreed to be the legal owner and proprietor of two lots of ground and the stores erected thereon, fronting on New Levée street, being Nos. 58 and 59, and, as such owner, that he be entitled to the possession and enjoyment of the same; and further, that said Delassus be ordered to authorize his wife to sign a renunciation in favor of the petitioner, and to give him an unincumbered title to said property; and, in case the court should be of opinion that his (petitioner's) claim to said property is not valid, and that an unincumbered title ought not to be executed by Delassus, then he prays that L. B Macarty be decreed to pay him the sum of seven thousand dollars, with legal interest; but, if the title to said two houses and lots be declared valid against Delassus, then he prays for a judgment against Macarty for two thousand dollars, with interest.

The facts upon which these claims are founded, are, that, in the year 1840, the defendant Macarty being about to absent himself from the State, for a considerable length of time, if not altogether, gave his power of attorney to Delassus, conferring on him as extensive powers in relation to the administration and management of his property and funds in this State as could well be given, and, among many special powers granted, was an authority to purchase any real estate that might be mortgaged to him, and also power to sell, on such terms and conditions as the agent should think advisable, a large quantity of immovable property, which was mentioned in the act. Under this power of attorney, Delassus proceeded to manage and control the property and business of his principal, until some time in the year 1843, when the property of D. T. Walden, a bankrupt, was offered at public sale by his assignee. Upon nine lots of ground and the stores erected on them, so offered for sale, Macarty had a mortgage, and, as appears from the marshal's deeds of sale, Gasquet became the purchaser of two of them, Macarty of five, and Delassus of two. Some questions have arisen about the adjudications made at the sale and their legal effect; but it is not necessary to notice them here. From the evidence it appears, that Delassus was under the impression that all the lots and stores had been adjudicated to him as the agent of Macarty, and it is admitted in the record, that he would swear that he believed that, under the power of

attorney, he had authority to sell them ; and the evidence leaves no doubt on our minds that McDonogh entertained a similar belief. Accordingly, a verbal agreement was entered into by which Delassus, as agent as aforesaid, was to sell the nine lots and stores to McDonogh, for $22,500 cash, being at the rate of $2,500 each. Some short time after this Delassus represented, that two of the lots had been, contrary to his expectation, sold to Gasquet, and that he could only convey seven stores, which McDonogh agreed to take ; and, at the request of Delassus, who represented that he had an urgent use for money to remit to his principal, McDonogh advanced $7,000 on the price, and on the following receipt: "Received from Mr. John McDonogh seven thousand dollars, on account of the property sold him, as per act of sale to be passed before H. B. Cenas, Esq., notary public ; said property is composed of seven stores, from the estate of D. T. Walden, Esq. New Orleans, April 18th, 1843. (Signed) Per Proc. L. B. Macarty, Auguste Delassus." Of this sum it is clearly proved, that $6,000 was, on the same day, invested in two bills of exchange, which were remitted to Macarty in Paris, who it is admitted received the same, and got the money for them, which he has used. The remaining $1,000, Delassus swears was employed in paying a debt for which Macarty was responsible. The power of attorney, and other necessary papers, were put into the hands of Cenas, the notary, to draw up the act of sale for the seven lots and stores, who, when he examined the former, discovered that although Delassus had an authority to purchase property, yet he had no authority to sell any but what was specified, and these lots made no part of the special property. This discovery, as a matter of course, put an end to the transaction. Delassus then told McDonogh, that the title to two of the lots and stores, to wit, Nos. 58 and 59, were in his own name, and that he would convey him those two, which was agreed to, and an act of sale, dated the 28th of April, 1843, was drawn up by the notary, Cenas, and signed by both Delassus and McDonogh, and attested by one witness, and so left for the purpose of obtaining the signature of Madame Delassus to her renunciation of all rights of mortgage and privilege, which formed a part of the

act. On the 18th of May, 1843, Delassus, for reasons stated in the letter of his attorney at law (which it is not necessary to state here,) addressed to the notary, declined proceeding to the completion of the act, and it remained in that situation.

From the accounts rendered by Delassus to his principal, for the months of May, June, July, August, September, October and November, 1842, it appears that at the end of each of those months, he had a large sum in his hands belonging to his principal. At the close of the last named month, the sum amounted to $84,968 78. The instructions of Macarty were, that $8,000 per annum were to be remitted to him in France, of which sum one-half was remitted semi-annually; the remainder of his funds the agent was to invest in this State. Delassus says that, at the time he got the money from McDonogh, he was then $6,000 in arrear of this remittance, and that he had no money of Macarty's at the time, and could not have remitted him any unless he had received this money from McDonogh. He re ceived other sums of money for Macarty, subsequent to November, 1842, but at what time, or how much, is not stated. It is not proved, nor contended that Macarty knew, when he received the $6,000, from whom, or how Delassus got it.

The foregoing appears to us a fair statement of the testimony, so far, as it relates to the controversy between the plaintiff and Macarty. Those portions of it which relate to the difficulty between the former and Delassus, we have endeavored to keep apart, as it seems to us that the consideration of the case has been much confused by arguing it as though it had been tried with Delassus, and he was a party before us. From the same cause, perhaps, has arisen some of the errors into which we think the district judge has fallen, who rendered a final judgment for the defendant Macarty, from which the plaintiff has appealed.

In his judgment the district judge says, that " the case has been tried as regards the defendant L. B. Macarty alone, upon the issue made up by his answer and supplemental answer.'' It is, therefore, important to see what those issues are, and whether they should have been tried without Delassus being before the court. The judge says truly, that those issues are not alto-

gether consistent with each other, nor are they responsive to the demand the plaintiff sets up against Macarty. He no where asks for a judgment against him for the two lots and the houses on them. That portion of the demand is directed against Delassus alone, and the demand against Macarty is exclusively for money; yet the court below has proceeded on the irrelevant and inconsistent pleas of one defendant, to decide a claim set up by the plaintiff against the other, who has filed no answer, and was not a party to the trial. In his first answer Macarty admits that Delassus held his power of attorney for specified purposes, and that the property at Walden's sale was adjudicated to J. R. Jennings and Madame Lalaurie, and that the assignee of Walden had conveyed it to Delassus, all of which he says, is contrary to law, and that those sales are void. He then proceeds to say that, he is informed, that Delassus purchased the property for him; but he avers that he had no authority to do so, and he refuses to acknowledge or ratify the purchase, wherefore the sale is null, and the property should be restored to the assignee of Walden, to be sold according to law; but if the sale is not annulled, then he says that he reserves his recourse on the assignee, who he prays may be made a party; and further avers that the sales to Delassus were intended for his benefit, and that he accepts them if he cannot procure their nullity, or his recourse on the assignee for the amount of the adjudication. There are other allegations in the answer equally contradictory of each other, and the prayers present various demands reponsive to the claims. That portion of the answer which directly applies to the plaintiff's demand against Macarty, denies that Delassus ever received any money from him, or remitted the same; wherefore he avers that the plaintiff has no claim as Delassus was never authorized to borrow money for him, or to remit him any, except such as he had collected from his debtors or tenants. The supplemental answer relates exclusively to the adjudication and title to the lots, and it is only necessary to say that it claims them on the ground that they were adjudicated to Delassus as agent for the defendant, and that he accepts them, and prays for a judgment.

In detailing the evidence, we have stated that it was admit-

ted on the trial that Delassus would swear that he had full au-
thority to sell the seven lots and stores.   The fact of the plain-
tiff's believing the same thing, is proved to our satisfaction, and
neither party was undeceived, until the notary carefully exam-
ined the power of attorney, and informed them of their error.
Before this was done, the plaintiff had paid the $7000 to Delas-
sus, as the agent of Macarty.   He acted under a full belief that
he was the agent, and paid the money in good faith on account
of what he believed to be a valid contract, which money was
received by the defendant, or was applied to his benefit.   This
is a clear case of money paid and received in error.   But as
soon as the notary explained to the parties the actual authority
conferred by the act of procuration, the position of things was
changed, and the contract Delassus then made with the plain-
tiff, as to the two stores, was not as agent, but as a party acting
for himself, in relation to a sale of property to which he had
an apparent title, and which he claimed as his own, whether
rightfully or not we shall not determine, until he is before us.

We now come to the only part of the case we propose to
decide at present, except so far as our judgment shall open the
question of the respective rights or claims of the parties to the
title to the property and the mortgage thereon, which is to be
hereafter settled, which is, can the plaintiff recover of Macarty
the sum received by Delassus as his agent, and by him appro-
priated to his use ?   The equity of the demand is so clear, that
we cannot hesitate in saying that the plaintiff ought to recover
unless there is some positive law to prevent it.   The counsel
for the defence here, and the judge below say, that there is such
a law, and they rely upon article 2134 of the Civil Code as pro-
tecting him from responsibility.   That article says: "If the
debtor give a thing in payment of his obligation, which he has
no right to deliver, it does not discharge his obligation, and the
owner of the thing given may reclaim it in the hands of the
creditor, unless it be discharged by the payment of money, or
the delivery of some of those things which are consumed in the
use, and the creditor has used them, in which cases neither the
money, nor thing consumed, can be reclaimed, and the payment
will be good."   This article we find under the head of payment

or performance in general, which is a mode of extinguishing a conventional obligation. It therefore becomes necessary to examine the contract of mandate, and see whether it gives rise, at once, to the relation of debtor and creditor, in the same manner as other conventional contracts do. Pothier informs us, that it is of the class of contracts " *de beinfaisance*," regulated by the rules of natural justice. The mandatary is obliged by the contract, to render an account of his agency to his principal; and if he does not, it gives rise to the action *manduti directa*, on the part of the principal against the agent, in case he should, without just cause, fail in executing the mandate with which he is charged, in which action he is liable to be condemned to pay damages and interest for his unfaithful conduct." Pothier, Contrat de Mandat, Nos. 2, 3, 51, 61. Story, in his Treatise on Agency, section 203, says, it is the duty of the agent to keep regular accounts of all his transactions on behalf of his principal, and to render them at all reasonable times, and to pay over or deliver all the property and proceeds in his hands. It is the duty of the agent to keep the property of his principal separate from his own, and not to mix it; if he does, and afterwards he is unable to distinguish between the one and the other, the principal, as a penalty, has a right to take all. Ib. No. 205. Our Civil Code says, that the agent is responsible in damages for the non performance of his duty: he is bound to render an account of his management, and to restore to his principal whatever he has received by virtue of his procuration, even should he have received it unduly. Articles 2971, 2973, 2974. From these authorities, it seems to us that the law does not, by the contract of agency, establish at once the relation of debtor and creditor between the agent and principal. That the former may finally become a debtor, and the latter a creditor, is undeniable; but not, we suppose, until the dissolution of the contract, and the neglect or refusal of the agent to account and pay over the funds and property in his hands. Whilst the agency continues, the property and money in the hands of the agent belongs to the principal: the agent is a trustee, and if he disposes of the property improperly, the principal can recover it from the possessor. The procuration in favor of Delassus

was not revoked, and he notified thereof, when he received the money from McDonough. It was not received by Delassus in his individual capacity, nor so paid to him by the plaintiff; but it was received as agent, on account of a contract which both parties believed he was authorized to make. Macarty had a right to receive the money, although unduly received by his agent; he did receive it; and when the error was discovered, he had no right to keep it, because his agent had not been faithful in other respects, and thus enrich himself at the expense of another. If Delassus had obtained this sum from the plaintiff in his own name, and had given it to Macarty, we should not pretend that he was responsible for it, unless the money had been stolen, or procured by a gross fraud, which is not alleged nor pretended. But such is not the case. The name and credit of Macarty was used by his agent in a manner in which he believed at the time that he was authorized to use it, for the purpose of getting the money. He received it by virtue of his procuration, and gave it to his principal, who must restore it. Article 2134 of the Civil Code is not, in our opinion, applicable to the case before us. Delassus did not give to Macarty a thing he had no right to deliver; on the contrary, what he gave he was bound, as his agent, to deliver; and, being proved to have been received and delivered through error, the money must be repaid. In his answer Macarty does not allege that Delassus was his debtor, nor that the money was received from him in discharge of an existing debt, although it was permitted to be shown at the trial, by Delassus' accounts, that he hadreceived large sums as agent, which had not been accounted for, and that no remittance had been made for a considerable time.

We are not prepared to establish, as a general rule, that the relation of principal and agent, is that of creditor and debtor as soon as the latter receives money or property for the former. We regard it as something more: it is a trust; and the receipt of the money or property does not give the agent a title to it, which would be the case if he be regarded as a debtor alone.

It is, therefore, ordered and decreed, that the judgment of the District Court be annulled and reversed, and that the plaintiff, John McDonogh, do recover of the defendant L. B. Macarty

the sum of seven thousand dollars, with interest at the rate of five per cent per annum from the 23d day of June, 1843, the day of judicial demand, with costs in both courts; reserving to the plaintiff, to Delassus, McCarty, and the assignee of Walden, all their rights or title to and mortgage on the lots Nos. 58 and 59, and the stores thereon, whenever the same shall come up for trial, whatever said rights may be.

### SAME CASE,—ON AN APPLICATION FOR A RE-HEARING.

An agent is a competent witness for his principal, in an action against the latter to recover a sum of money, alleged to have been paid to the agent through error, and admitted to have been paid by him to his principal. The witness is indifferent, being responsible to one or the other party for the amount in controversy.

*L. Janin,* for a re-hearing. The defendant Macarty left New Orleans in 1840, for France, and entrusted the management of his extensive property in this city, consisting of houses, money loaned on interest, &c. to Delassus, to whom he gave a notarial power of attorney. Among other things, this power of attorney authorized Delassus to buy, if offered at judicial sale, any property upon which his principal had a mortgage, but not to sell it again, nor to borrow money. By private instructions, Delassus was directed to send to Macarty $8,000 a year, in semi-annual instalments. The evidence shows that Macarty's income greatly exceeded this amount.

Delassus proved an unfaithful agent. His accounts show that in November, 1842, he owed Macarty $84,968 78. He was examined as a witness in the case, and stated under cross-examination, that since November, 1842, the amount of his debt had increased; that in April, 1843, nine months of the usual remittance were in arrears, and that he had appropriated to his private purposes every dollar of the balance which Macarty had in his hands.

Daniel T. Walden, a person on whose property Macarty had mortgages to the amount of $56,000, went into bankruptcy in 1842. The property on which Macarty's mortgages bore, con-

sisted of nine brick stores on New Levée and Commerce streets. Walden had also other stores of the same description and in the same vicinity: all were sold on the 14th of January, 1843, by the United States marshal, under an order of the court of Bankruptcy. At this sale Delassus bought eight of the mortgaged stores for Macarty, another was adjudicated to Jennings, but Delassus took the bid off his hands for Macarty. For the sake of entire correctness it ought to be stated, though it is immaterial for the present suit, that two of these stores were in reality adjudicated to Wm. A. Gasquet, but that, by consent of parties, the adjudication was changed to Macarty's name; the assignee made a sale of them to Delassus, as Macarty's agent, and he sold them immediately afterwards to Wm. A., and James A. Gasquet. This unauthorized sale has given rise to another suit now pending on appeal. The whole amount for which the nine stores were adjudicated was $49,100. McDonogh was present at the marshal's sale, and bought four pieces of property, amounting to $30,400.

McDonogh's petition, which was filed on the 23d of June, 1843, states, that on the 16th of April, 1843, Delassus, as Macarty's agent, agreed to sell him nine stores fronting on New Levée and Commerce streets, which Delassus alleged he had bought on account of L. B. Macarty, at the assignee's sale of D. T. Walden's estate; that this sale was to have been made for $22,500, that is at the rate of $2,500 each store; that Delassus afterwards represented to him that, upon examination, he found he had bought only seven, and not nine stores; and that, therefore, it was agreed that these seven stores should be sold for $17,500, still at the rate of $2,500 a store. It is, indeed, in evidence, that a notary was instructed by them to draw up such a bill of sale. Before it was completed, Delassus represented to McDonogh that he was in need of funds to make a remittance to Macarty, and requested him to advance $7,000 on account of the contemplated sale. In consequence of this request, McDonogh paid him $7,000, and took the receipt transcribed in the opinion of the court.

A few days after this, Cenas, the notary, while preparing the deed, examined the power of attorney from Macarty to Delas-

sus, and finding that it did not contain the power to sell, informed McDonogh of it. This put an end to the projected negotiation. Delassus then said that he could pass a sale of at least two of the stores, as they were in his own name. These were stores No. 58 and 59 on New Levée street. One of them had been adjudicated at the assignee's sale to Macarty, but Delassus had desired the assignee to make the sale to Madame Lalaurie, whose power of attorney he also held. The other store had been adjudicated to Jennings, but as already stated, he had surrendered the adjudication to Delassus, for Macarty. Macarty's mortgage bore on both these stores. At the renewed request of Delassus, Walden's assignee consented to disregard the sale to Mme. Lalaurie and the adjudication to Jennings, and to pass the sale to Delassus. The assignee states in his testimony, that it is customary, after such adjudications, to change the name of the bidder, if all the parties agree to it. This done, the notary proceeded to make out the sale of the two stores by Delassus, in his individual name, to McDonogh. The sale was prepared; the price, however, of which the notary had not been informed, was yet left in blank, when both McDonogh and Delassus went into the office of the notary and signed the act. After the signature, Delassus stepped to the fire place and warmed himself; McDonogh approached the notary's clerk and said, " Fill up the blank with $5,000," and this was accordingly done. Let it be remembered, that on the 14th of January, 1843, they were adjudicated at $13,650. Delassus shortly afterwards left the office, and the next day he returned, and, looking at the act, observed that the price agreed upon was $5,000 for each of the stores, and not, as the act stated, $5,000 for both: he also said, that he had not heard the directions given by McDonogh to the notary's clerk, after the signature of the act. The notary and the clerk, without being positive, believe that Delassus might have heard McDonogh's directions. However this may be, Delassus refused to permit his wife to sign the renunciation in the sale which had been prepared for her, and to deliver up the stores, and they were afterwards taken possession of by Macarty's new agent. McDonogh then brought this suit, on June 23d, 1843, before Macarty's return from Europe. He

prayed that both Delassus and Macarty might be cited; that the stores might be sequestrated; that he might be declared to be the owner of these stores; that Delassus might be ordered to authorize his wife to sign the renunciation; and that, if it should be held that he had not a good title to the stores, Macarty might at least be ordered to refund to him the $7,000, which he had paid to Delassus on the 18th of April. This is an accurate summary of the prayer of the petition, to which we shall have occasion to revert.

A judgment by default was taken against Delassus, but not confirmed. Macarty filed an answer and a supplemental answer. The case was tried, and the District Court decided that McDonogh had no title to the lots, and could not even recover the $7,000.

The Supreme Court now holds that Macarty must refund to McDonogh the $7,000, refuses to decide on the title to the two stores, and reserves to Macarty, McDonogh and Delassus, "all their right or title to, and mortgage on the lots Nos. 58 and 59, and the stores thereon, when the same shall come up for trial, whatever said rights may be."

This decision is contrary to the prayer of the plaintiff, and contrary to the nature of this suit. Under no circumstances can McDonogh recover the $7,000, unless it has first been decided that he has no title to the property on account of which he paid it. This seems to be obvious beyond argument. Consistently with its present opinion, the court should have decided at the same time, that McDonogh had no title to the lots, for if the sale is good, the payment is good. The defendant Macarty should not be exposed to the trouble, risk and expense of a second suit involving the title.

We now beg leave to state what, in our opinion, the judgment of the court should be, under the pleadings and the evidence of the case.

The pleadings of the plaintiff have already been mentioned; those of the defendant, Macarty, were drawn up in the alternative, in order to meet the facts, as they might in the sequel be disclosed. When the first answer was filed, Macarty was still in Europe, and his representatives were as yet, and professed

themselves, quite ignorant of what had happened between Delassus and McDonogh, the assignee, the notary, &c. Nor had they time for tracing up the devious and intricate course of these dealings, for McDonogh had commenced by sequestrating the stores in their hands. Unless they gave bond within ten days, McDonogh would have had the right, under the act of March 5th, 1842 (p. 204), to bond them himself, and claim possession of the stores. They did not, nay they could not know, whether the real state of the facts was of such a nature as to make it safe to claim title in Macarty's name. They therefore considered it necessary to file an answer at the same time as the bond, in order to explain the ground upon which they claimed the right of bonding, and to prevent misconstruction; and thus they were enabled to state in substance, that although they yet were ignorant whether Macarty had a title to, or only a mortgage on these lots, still he had an interest in them, in one or the other capacity; wherefore they insisted on provisionally retaining possession thereof, promising to account for the rents, if the court should hold that Macarty was not the owner. This answer was filed on the last of the ten days, a delay which was insufficient to enable them to ascertain all the circumstances which appeared on the trial, of some of which they indeed then heard for the first time.

Under these circumstances the answer assumed several hypotheses, and alleged :

1. That the lots were adjudicated to Mme. Lalaurie and Jennings, and that the transfer of the adjudication to Delassus could not impair Macarty's rights as a mortgage creditor.

2. That if it should be held that the transfer of the adjudication to Delassus, vested in him personally a title, the sale was void, and the property should be returned to the bankrupt estate, because an agent cannot buy at auction the property, the sale of which he is directed to procure. 18 Duranton, No. 206.

3. That if Delassus intended to buy the property for his own account, and the assignee permitted him to pay for it by a release of Macarty's mortgage, and thus enabled him to resell it free of mortgage, the assignee was responsible to the defendant Macarty, for the amount of the adjudication. For an agent cannot

give a release to himself in the name of his principal. *Beal* v. *McKernian*, 6 La. 407.

4. That if it should appear that Delassus, although he bought the property in his own name, intended to take it for Macarty's account, and that this form of the sale could commit the rights of Macarty to the property, and enable McDonogh to obtain rights to it, then the defendant Macarty, repudiated the adjudication, because he had authorized Delassus to buy in certain property in his (Macarty's) name, but not otherwise.

5. That even if the form of the assignee's sale could vest rights in a *bona fide* purchaser, to Macarty's detriment, still it could not benefit McDonogh, who knew that Delassus was throughout dealing as Macarty's agent, and who surreptitiously obtained a sale of the two lots for $5000, well knowing that three months previously they had been sold at public auction for $13,650, which amount they are fully worth.

6. That if the adjucation to Delassus could enure to the benefit of Macarty, without giving any rights to McDonogh, the defendant Macarty was willing to abide by it.

7. That whether it should be held that he, Macarty, had a title, or not, it was clear that McDonogh had none, and that as to McDonogh he had a right to retain the possession of the stores, and provisionally to receive the rents thereof.

8. That the receipt of the $7000 by Delassus, being unwarranted, inasmuch as Delassus had no power either to sell the property or to borrow money, Macarty was not bound by it, nor responsible for the amount.

9. And, finally, the answer prayed for general relief.

Afterwards Macarty filed a supplemental answer, which states "that the transactions mentioned in the original answer took place during the respondent's absence from this State, and without his knowledge; that when it became necessary to file an answer in the suit, your respondent was still not fully informed of the occurrences connected therewith, and that in consequence thereof said original answer contains several omissions and inaccuracies." The supplemental answer then proceeds to state that lot No. 58 had originally been adjudicated to Delassus for, and in the name of the defendant Macarty; that

thereby a title was vested in him, which Delassus' subsequent agreement with the assignee to transfer the adjudication to Madame Lalaurie, could not divest ; and that he therefore claimed the ownership of that lot. And finally the answer stated, as another reason of the nullity of the assignee's sale to Delassus, that it had not been recorded in the office of conveyances.

At the trial, it further appeared that Jennings, to whom lot No. 59 had been adjudicated, had transferred his bid to Delassus for *Macarty.* This agrees with Delassus' first statement to McDonogh, for he proposed to sell this property as Macarty's agent, and it was only after the notary had informed McDonogh, that Delassus had no right to sell, that Delassus took this property in his own name.

Upon these pleadings, the District Court decided :

1. That the original adjudication of lot No. 58, in Macarty's name, vested a title in him. Civ. Code, art. 2586, 2595, and the late case of the *Succession of P. N. Boudousquié,* 9 Robinson, 405.

2. That the adjudication of lot No. 59, to Jennings, and Delassus' agreement with Jennings to take the bid for Macarty's account, also vested a title in Macarty, Delassus being authorized to buy such property.

3. That a title thus vested in Macarty could not be divested by any act of Delassus, who was not authorized to sell. Least of all could he make a transfer of the adjudication to himself.

4. That although Macarty had received $6000 of the money paid by McDonogh to Delassus, still as Delassus was indebted to him in a large amount, and Macarty was not informed of the origin of this money, but evidently must have supposed that it was a remittance on account of what Delassus owned him ; and as furthermore it was admitted that Macarty had immediately employed this money in the payment of debts and travelling expenses, he could not be called upon to refund it. Civil Code, 2134.

The court has been pleased to find that these pleadings are " irrelevant and contradictory," and that they have betrayed the District Court into the confusion which its judgment exhibits, by deciding on the title, which was only in issue with Delassus.

But it is submitted that the title was at issue with Macarty. The petition was indeed drawn up under the belief that Delassus claimed to be the owner of the lots, and had them in his possession, but it is directed against both Delassus and Macarty, and the plaintiff prays generally to be recognized as the owner of the lots. This is a petitory action which can only be directed against the possessor of the property. The lots were in Macarty's possession at the time of the institution of the suit, they were sequestered in his hands and bonded by him, and he claims title to them in his answer, under a certain state of facts, which the evidence has since shown to be the true one. Both in the inferior and the Supreme Court, the parties tried this issue of title, and it seems certain that if the court did decide that McDonogh's title is good, Macarty could not contend that this was not *res judicata* as to him, on the ground the judgment by default against Delassus had not been made final. Thus the matter was viewed by the plaintiff himself. The petition says: "If it is to be decided that the said sale is to be rescinded, then the petitioner is entitled to a judgment against said Macarty for the sum of $7000," &c. And the prayer of the petition asks: "In case the court should decide that the title of the petitioner is not valid and ought not to be executed, and that an unincumbered title is not given, then that judgment may be given against said L. B. Macarty for $7000," &c.

Hence, it follows, that if the title is not at issue, the appeal must be dismissed, there being nothing before the court.

But it is again submitted that the title is at issue, and ought to be adjudicated upon by the court.

As to the last point of the case, the only one decided by this court, viz., McDonogh's claim for the reimbursement of the $7,000 paid by him, on the 18th of April, 1843, to Delassus. It appears in evidence, that in the beginning of 1843, Macarty, who had then long been without his usual remittances, and suspected that his affairs had been mismanaged by Delassus, sent his nephew, Paulin Blanque, from Europe to New Orleans, with directions to look into his affairs, and to urge Delassus to make remittances, of which Macarty was in the most pressing want. Delassus refused to render an account to any one but

Macarty himself, but admitted that he was largely in Macarty's debt. He also promised constantly to make remittances, and at last, in April, handed to P. Blanque, two bills of exchange to Macarty's order, to be sent to Macarty, without telling Blanque from what source he got the money. These bills were received by Macarty in Europe. It is admitted that he immediately spent their proceeds, in the payment of debts, &c. At the trial of the suit, Delassus was called as a witness by the plaintiff. He stated that, by his own accounts, he owed Macarty, in November, 1842, $84,968 72; that since then his debt had increased; that when he received the $7,000 from McDonogh, he had no money of Macarty's on hand, the meaning of which is, that he had spent it all for his personal wants and private affairs; that he had employed $6,000 out of the $7,000 he had received from McDonogh, in the purchase of the two bills of exchange alluded to, and $973 or $975 of the remaining $1,000 in the payment of a note for which Macarty was responsible. There is no evidence whatever of the $7,000 except Delassus'—if that is rejected, this part of the case fails. All the testimony was received subject to all legal exceptions. We have therefore a right to object to the testimony, relating to the note of $973 or $975. This must be produced or accounted for; better, clearer, more tangible and examinable testimony must be produced of such a fact. Besides this general reservation, a special bill of exceptions was taken to the admission of Delassus as a witness, on the ground that he is interested and a party to the suit. That not even a nominal party to a suit can be examined as a witness, has been decided in *Stein* v. *Bowman*, 13 Peters, 209. Delassus' interest is a moral one, which may impeach his testimony though not render it inadmissible, and a pecuniary one for costs. The latter is undoubted. The plaintiff prays that Delassus may be ordered to perfect the title, and that, in case it should be held that he has not a good title, Macarty may be condemned to pay him $7,000. If the plaintiff obtains a judgment on the first branch of his demand, Delassus has to pay the costs; if on the second branch, Delassus pays no costs, and they fall on Macarty alone. That a responsibility for the payment of costs renders a witness inadmissible, is an elementary principle.

But in case Delassus' testimony could be admitted, Macarty is protected by art. 2134 of the Civil Code. The court, however, makes a distinction between an agent who is in debt to his principal and another debtor, and by this distinction takes Macarty out of the rule.

Macarty did not allege in his answer that the money was received in discharge of a previous debt, because he did not know it, and, until the moment of the trial, he had not even a suspicion that it would be attempted to prove that he had McDonogh's money.

That plausible and specious arguments may be made in favor of the position of McDonogh's counsel, cannot be denied; they are never wanting in the infinite number of cases in which two innocent parties endeavor to throw upon one another, the loss occasioned by the fraud, or fault of a third party. But the law puts limits to such generalities; unwilling to leave every thing to judicial discretion, unable to provide for every shade of incidents, it furnishes rules for this class of cases, framed to work best in the greater number of instances. Occasional individual hardship is a less serious evil than universal uncertainty. One of these rules is that contained in art. 2134, which has stood the sanction of ages, having been transmitted from the Roman to the French, Spanish, and our own laws. It is certainly a hard case that A., whose money has been taken to pay a debt due to B., should not be permitted, with full proof of the fact, to claim it from B. B. undoubtedly was enriched at the expense of A. But it would be infinitely worse if money could be followed from hand, through a chain of titles, like a tract of land. "L'équité," says Bigot-Préameneu on the corresponding art. of the French Code (1238), "ne permet pas que le créancier qui l'a consommée de bonne foi puisse être inquiété. Ce serait une révendication, et il ne pent y en avoir que contre le possesseur de mauvaise foi, ou contre celui qui par fraude a cessé de posséder." See also 11 Toullier, 129. 12 Duranton, 43, 48. Dig. Lib. 46, Tit. 3 (de Solut) l. 78. The distinction admitted by the court would deprive the infinitely important and numerous transactions between principal and agent of the protection of a vital law. Art. 2134 applies only to a payment made

by a debtor to his creditor, and the court holds that an agent is not a debtor in the sense of this article, " until the dissolution of the contract of agency, and the neglect, or refusal of the agent to account and pay over the funds and property in his hands." We submit that *perhaps* an agent becomes a debtor, as soon as he receives property of his principal for which he is accountable, and that he certainly is a debtor from the moment he mixes the principal's funds with his own. If, for instance, a commission merchant deposits all the funds of his customers in bank, in his own name, and the bank breaks, can he, as a depositary might, relieve himself by returning the worthless paper, or is he not responsible for the loss ? *A fortiori* is the agent a debtor, when, like Delassus, he refuses to account, admits his indebtedness, and states, under oath, that he has spent his principal's money. He is so much a debtor that the law calls him a defaulter, and condemns him to pay interest, without being put *in mora*. " The attorney is answerable for the interest of any sum of money he has employed to his own use, from the time he has so employed it ; and for that of any sum remaining in his hands, from the day he becomes a defaulter by delaying to pay it over." Civil Code, art. 2984. The law favors a *bona fide* payment made to a creditor, because he has a reasonable ground to expect a payment from his debtor. And who has better reasons to count upon payment than the principal from his agent? The broad statement of the court amounts, in practice, to this, that if one who is the agent both of A. and B., should take the money of A., and repay, with it, funds placed in his hands by B., A. can recover it from B., at any time, although B. should have received and consumed it in good faith. It would be easy to cite numerous instances of daily occurrence where infinite mischief and confusion would result from the distinction now, for the first time, sanctioned by this, or, it is believed, by any other court. The evil of this decision would be but little diminished by the further distinction that an agent would be viewed like another debtor, after the revocation or the expiration of the power of attorney. By far the greater number of payments are made by agents during the continuance of their agency.

It is true that farther on, the court says that Macarty must be responsible for the money, because Delassus gave the receipt in his (Macarty's) name. "If," says the court, "Delassus had obtained this sum from the plaintiff in his own name, and had given it to Macarty, we should not pretend that he was responsible for it, unless the money had been stolen, or procured by a gross fraud, which is not alleged, nor pretended." This is in direct contradiction of the important part of the decision immediately preceding it and just commented on. There the court said that in order to take a payment out of the rule of art. 2134, it was sufficient that the relation of principal and agent had not ceased, because, until then, the agent could not be called a debtor. And the meaning of the passage now under review is, that if the agent receives A.'s money in his own name, and pay it to his principal, B., the payment will be good, although the relation of principal and agent has not ceased. This must then be because the agent, although an agent, is yet a debtor, in the sense of art. 2134. Let us recur to the text of the article.

"If the debtor give a thing in payment of his obligation, which he has no right to deliver, it does not discharge his obligation, and the owner of the thing given may reclaim it in the hands of the creditor, unless it be discharged by the payment of money, or the delivery of some of those things which are consumed in the use, and the creditor has used them. in which cases neither the money, nor the things consumed can be reclaimed, and the payment will be good."

The inquiries to which the application of this article gives rise, are : 1st. Is the paying party a debtor? 2d. Is the receiving party his creditor? 3d. Had the debtor a right to deliver the thing which he gave in payment? 4th. Was the payment made in money, &c. ? The first of these questions, is decided by the court in two opposite ways.

The 2nd and 4th of the above questions are of no interest in this suit, but the 3d must detain us a moment. Had Delassus a right to deliver McDonogh's money? Assuredly not, because it did not belong to Macarty. Here the court comes to a different conclusion for which it relies on art. 2974. "He" (the attorney in fact) "is bound to restore to his principal whatever

he has received by virtue of his procuration, even should he have received it unduly." Delassus, says the court, received the money by virtue of his procuration. We submit that he received it in opposition—in violation of his procuration. He received it for the price of Macarty's property, which he had no right to sell. An attorney would receive by virtue of his procuration, though unduly, if, charged with the collection of debts, he extorted more from the debtor of his principal than was really due ; if, being authorized to sell, but having private instructions not to sell, he nevertheless made a sale ; if, having the power to borrow, he borrowed without necessity. Acting in virtue of a power of attorney means acting under and in obedience to it, doing something that it permits, and therefore representing the principal. It is because in these acts he represents the principal, that he must transmit what he has received. But the attorney who does something which he is not authorized to do, does not represent and bind the principal, whether he use his name, or not. Story's Agency No. 156. 18 Duranton p. 228, No. 332. He no more acts by virtue of his power of attorney, than he who pretends to have a procuration, and never received any whatever from the principal. Both are equally pretenders. Acting by virtue of a power of attorney, would be construed by the court into meaning the same thing as acting under the pretence of one. But the best proof that such a payment as was made by McDonogh to Delassus, was not one of those to be transmitted to the principal, according to art. 2974, is this, that if it became, after the transmission of the money to Macarty, equivalent to a payment to Macarty, Macarty would at once be considered as having ratified the illegal sale, a conclusion so obviously wrong that the premises which lead to it cannot be right. Macarty could not have claimed the money from Delassus without having ratified the sale. How could then Delassus be bound to transmit it to him, without first knowing whether Macarty would approve the sale ? The real, or pretended ignorance of Delassus of the contents of his power of attorney, cannot possibly make the least difference, and deserves not be discussed ; this belief could not affect the question of ownership. Art. 2134 makes the question dependant upon the

fact, not upon the belief of the fact. It is indeed a startling and indefensible proposition that the writing of such an attorney, nay his simple belief in matters beyond his authority, without the knowledge, or approbation of the principal, should be suffered to produce any effect whatever.

It is also worthy of note, that neither the court, nor the plaintiff's able counsel, adduce the least authority in support of the distinctions which they make while construing articles 2134 and 2974. The equity of this case is with Macarty. Was McDonogh indeed the innocent unsuspecting purchaser that he represents himself to be? Let us review his conduct. He is present, and a large purchaser at the bankrupt sale at which the nine stores mortgaged to Macarty are adjudicated for $49,100. These he agrees to purchase, three months afterwards, for $22,500. Macarty's large and unincumbered fortune was well known to him ; so was the value of the property, as fully equal to the amount of the adjudication. Should he therefore not have suspected foul play? Could it have escaped his penetration that this was the closing attempt of an unfaithful agent, knowing that he would soon be deprived of the power of increasing the losses of his principal, and determined therefore to make one large, last, final haul? And after two of the nine stores are sold to the Gasquets, and Delassus has also received, and appropriated to himself their proceeds, McDonogh makes another agreement to take the remaining seven stores, which cost $37,150 for $17,500. And when this sale fails, he insists upon claiming two houses, which cost $13,650, for $5,000 ! Thus far goes the evidence ; the remainder are conjectures, in forming which the court needs no assistance. McDonogh was at least guilty of singular negligence in not examining the power of attorney sooner, nor can this be explained in any other manner, than by his eagerness to make an unconscionable bargain at Macarty's expense. Macarty, on the other hand, had placed on record a power of attorney drawn up with much care and precision ; he had used every necessary precaution for the protection of those who might have business with him during his absence.

GARLAND, J. The complaint of the counsel of the applicant

for a re-hearing is two-fold: *first*, that we have not decided in his favor one part of the case, upon which we gave no opinion at all, because the rights of other persons than those before us were involved, and they had not been heard in the court below; and, *secondly*, he complains, that what we did decide is erroneous. The purport of the argument submitted is, to prove that what has been decided is inconsistent with that which has not been acted on at all. The counsel has possibly satisfied himself that he has discovered errors in the opinion of the court, which he endeavors to make appear, in, we believe, nearly every case that is decided adversely to him; but it does not follow that those errors are so apparent to others, who do not look at the case through the same medium, and endeavor to see both sides of it.

One object of the petition is, if possible, to draw from the court an opinion upon a part of the case which we said we would not decide, as it was now presented to us, and we see nothing in the reasoning of the counsel to induce us to change that determination.

Upon that part of the case which we did decide, the counsel has not favored us with a single authority or argument that was not considered before we came to the conclusions we have arrived at. There is nothing alleged to affect, in any manner, the positive provision of the Civil Code, which says, that the agent is bound to give to his principal whatever he has received by virtue of his procuration, even should he have received it unduly. It is not denied, and it is undeniable, for it was, in effect, admitted on the trial, that Delassus, at the time he received the sum of $7000 from the plaintiff, really believed that he had authority to sell the property; and there is no doubt that the plaintiff, at the time, also believed it. The power of attorney gave Delassus authority to sell a large amount of real estate, which power was probably exercised, and induced a belief that he had authority to sell that on account of which the money was received. It is well settled, that an agent can only contract within the limits of his authority; but it is equally true, that his conduct and dealings with others, on behalf of his principal, are evidence from which an authority may be inferred.

Delassus was here, with an authority to administer generally a large estate, real and personal, and with special power to sell a number of houses and lots, and also to purchase real estate, under certain circumstances. He is seen at a public sale exercising a part of his authority, to wit, the power to purchase. He really believed that he had also the power to sell the same property, under the clause of the procuration authorizing him to sell, and so informs the plaintiff, who believes it, contracts with him, advances money on the faith of the contract, which goes directly into the pockets of the defendant Macarty, and when the error is discovered, the latter says that he is not bound to refund it, because it has been expended, and his agent, having been unfaithful in other respects, has become thereby his debtor.

The more the evidence in this case is examined, the more apparent does the error, under which the parties acted, become. The money received by Delassus, as agent of the defendant Macarty, was never mingled with his own funds, according to the testimony of Pellerin, Nathan, and his own; but was invested at once in bills of exchange to the amount of $6,000, which were remitted to the defendant Macarty, by Blanque, and the balance disposed of in paying a debt for which Macarty was responsible. The sum received was given to the principal, and being unduly received, as we have before said, must be restored.

The counsel has further urged, that Delassus was not a competent witness, and now insists on a bill of exceptions which he took to his being admitted as such, which he alleges he urged in the argument. We have no recollection of that fact, no note having been preserved of the point; but we are willing to admit that he did, as he so states, and have considered the bill.

As a general rule, an agent is a competent witness in suits in favor of or against the principal. There may be exceptions to the rule; but we do not think that Delassus comes within any of them, in this case. As between the plaintiff and defendant Macarty, we do not see such an interest, for or against either party, as should exclude the testimony of the witness. If the plaintiff had not succeeded in this case, it is quite probable that Delassus would be responsible to him for the money received;

but as he obtains a judgment, then the amount which the defendant Macarty alleges that the witness is answerable to him for is increased by the sum of $7000, so that the witness stands responsible to one party or the other. His ultimate responsibility for costs on the demand alleged against him, does not, in our opinion, exclude him as between the other parties in the case. The re-hearing is refused.