HON. J. G. TALIAFERRO,
HON. R. K. HOWELL,
HON. W. G. WYLY,
HON. W. W. HOWE,
} *Associate Justices.*

---

No. 1388.—POINDEXTER AND POLLARD, Appellees, *v.* JOHN E. KING, Appellant.

A suit to recover on a contract of agency is prescribed by ten years. 15 An. 534; 16 An. 397; 17 An. 246.

When an agent, acting in the capacity of a commission merchant, has received produce on consignment, with instructions from the shipper to sell the same for gold, he can not discharge his liability to the principal by accounting for the net proceeds in a depreciated currency of less value than that for which the property was sold, although that currency be a legal tender dollar for dollar.

An account stated and acknowledged by the other party becomes a closed account, but it may be re-examined afterward by either party for the purpose of correcting errors or supplying omissions.

APPEAL from Sixth District Court, parish of Orleans. *Duplantier,* J. *Race, Foster & E. T. Merrick* for plaintiffs and appellees. *Marr & Foute* for defendant and appellant.

WYLY, J. In 1861, plaintiffs consigned to defendant seventy-four hogsheads tobacco, which were sold by the latter for account of plaintiffs in December, 1862, for $14,338 36 in gold, and account current thereof promptly rendered by defendant.

88

During the year 1861 plaintiffs drew on defendant their several bills, amounting in the aggregate to $8436 36, which defendant accepted and paid out of his own funds, and for which, with interest, plaintiffs became his debtor.

Immediately after the sale of the consignment, as aforesaid, the defendant paid over the cash balances in gold to Messrs. Watt, Given & Co., as requested by plaintiffs, to wit, $4533 92.

On twenty-first September, 1863, plaintiffs wrote to the defendant, objecting to some of the items of the account, and stating, "now we claim that you owe us the premium the gold was then worth—

On amount of bills_____ $8,436 36
On amount of commissions _____   210 90
On amount of interest balance_____   785 76

Total_____ $9,433 02

Plaintiffs' petition alleges "the difference of value of gold and currency of the city at the date of said transaction was fully thirty per cent. in favor of gold, which on said sum of $8436 36, and the interest charge of $785 76, makes the full sum of $2881 91, which, added to the $210 90 erroneously charged for commissions, makes the sum of $3092 81." To recover this $3092 81 this suit has been instituted.

The court below gave judgment in favor of plaintiffs, and defendant has appealed.

Plaintiffs contend that their factor, John E. King, could not apply the gold proceeds of the tobacco to the extinguishment of his account against them for bills drawn on said consignment in 1861; that as their consignee he should have allowed them the premium of thirty per cent. in favor of gold in settlement of his said account, and that he should not have charged them two and a half per cent. commissions on the various bills drawn by them against their said consignment.

Plaintiffs contend that their factor paid these bills in currency, and in his account charged them as paid in gold, or applied their gold to the payment of his account.

There is no positive evidence in the record to establish the allegations of plaintiffs. The bills drawn by plaintiffs in 1861 could not have been paid in United States treasury notes, because they were not then in circulation in this city. The act authorizing issue of legal tender notes only passed twenty-fifth February, 1862. There is no allegation or proof that said bills were paid by the drawee, the defendant, in Confederate notes; and we can not presume that the parties before this court dealt in an unlawful currency.

It is true, the record shows that "the banks in New Orleans suspended specie payment on seventeenth September, 1861, excepting the Southern Bank." But it does not follow that defendant could not pay the various drafts of his consignors in lawful money without doing so through the banks.

It seems the various bills accepted and paid by defendant were given in part payment for the tobacco which plaintiffs had bought and shipped to him. Plaintiffs must have received a lawful consideration for the bills, and what difference was it to them how the drawee paid the payee thereof? The bills were made payable in dollars and not in any particular currency.

Now, if plaintiffs had desired to ascertain positively in what currency the bills were paid by the defendant, why did they not get the evidence of the payee of those bills, who could state positively how he was paid and in what currency?

Defendant occupied the position of factor toward the plaintiffs, and also the position of creditor for the amount of his individual funds advanced to pay plaintiffs' bills. What was the relation of the parties to each other on eighth December, 1862, the day the consignment of tobacco was sold? Plaintiffs were owing the defendant the amount of money he had advanced for them and interest thereon. They were not owing him the illegal charge of two and a half per cent. commissions on the bills drawn against the consignment in his hands. On the other hand, the defendant was owing the plaintiff the full amount of the net proceeds of the sale of tobacco.

At once, by operation of law, the entire indebtedness of plaintiffs to defendant became extinguished by compensation, and defendant was only owing the plaintiffs the balance due out of the proceeds of said consignment. Compensation only extinguished the amount of lawful indebtedness of plaintiffs to defendant in lawful money. Gold is lawful money of the United States; and an indebtedness in dollars can be compensated by a counter indebtedness in gold.

At the time the bills were drawn and delivered to the payee specie was the only legal tender of the United States. In the absence of positive evidence we must presume that the defendant paid those bills in lawful money, and plaintiffs became indebted to him from the time of the payment thereof.

We think, then, on eighth December, 1862, all debts, lawful claims, against plaintiffs became extinguished by compensation, and that defendant then occupied the relation of factor toward plaintiffs, owing them only for the balance of the proceeds of the tobacco. Defendant seems to have acted faithfully for his consignors; his sale seems to have given satisfaction, and he paid over the $4533 92 in gold promptly to Messrs. Given, Watt & Co. at the request of plaintiffs. Indeed plaintiffs were very late in raising any objection to defendant's account current, rendered to them nearly nine months before.

We do not think the plea of usury, set up by defendant, applies to this case.

We regard this as an action of mandate, not prescribable in three years as an open account. Ten years is the only prescription against such a demand. 17 A. 246, and the authorities there cited.

Under the circumstances of the case, we believe that defendant is only indebted to plaintiffs $210 90, the amount of the illegal charge made by him for commissions on plaintiffs' bills.

It is therefore ordered and decreed that. the judgment of the court below be avoided and annulled, and proceeding now to give such judgment as the court should have rendered .in this case, it is ordered, adjudged and decreed that plaintiffs have judgment against defendant for $210 90 with five per cent. interest thereon from eighth December, 1862, and the cost of the court below, plaintiff to pay cost of this appeal.

---

*Mr. Justice Taliaferro, dissenting* :

I am unable to arrive at any other conclusion than that the defendant paid the Hoover drafts, amounting to $5456 36, in what was called "currency." These drafts fell due on the twenty-ninth of January, 1862. All the facts in the record point to this conclusion as inevitable. Jacob Barker states that the banks in New Orleans suspended specie payments on the seventeenth September, 1861, except the Southern Bank. He states also that from the eighth to the fifteenth December, 1862, gold was forty per cent. premium for treasury notes; and that on the fourteenth February, 1862, gold was at thirty-seven and a half per cent. premium for treasury notes. It is in evidence that in December, 1862, business in New Orleans was mainly done in currency. (Record, p. 14.) The defendant in December, 1862, paid over by order of his principals to Given, Watt & Co. in gold $4533 92. A member of that firm swears that for this payment in gold the firm credited the plaintiffs with $5726, the amount they owed that firm. This is the same thing as paying the debt in "currency," for the defendant required them to receive $4533 92 in gold, as equivalent to $5726 in currency. I can not suppose that, having paid a debt of his principals in currency, after he had received the gold proceeds of the tobacco, he paid the Hoover drafts in gold or silver ten months before he had funds of any kind in hand belonging to his principals. He could not have paid these drafts in paper money of any kind which was of equal value with gold or silver, for there was at that time in this country no such paper money. Hedged around as he is by the evidence in the record, I think it illogical to deduce that the defendant paid these drafts in gold or in bank notes, convertible at will into specie, because it is not affirmatively shown that he made the payment in depreciated currency. On the contrary, all the facts in evidence raise a legitimate and very strong presumption against him, which must prevail in the absence of any proof tending to rebut that presumption.

Considering it then established that he did pay the two Hoover drafts in "currency" thirty-seven and a half per cent. below the value of gold, and that he charged the amount dollar for dollar against the gold proceeds of the tobacco, I think he ought to account to his principals for the premium on gold for "currency" at the time the payment was made, or rather the thirty per cent. premium claimed by the plaintiffs in their petition.

The relation that existed between the parties was clearly that of principal and agent or factor; standing in that relation, the primary duty of the defendant was strict fidelity to the interests of his principals and a proper regard of his legal obligation to restore to them all profits that may have arisen from, and to give to them the benefit of all advantages that may have grown out of their business entrusted to his care. Civil Code, article 2974; 10 Rob. 487.

I do not think the plea of prescription can avail the defendant. The claim simply of the gold premium can not be assimilated to an open account standing isolated from the business of the mandate. It springs from the transactions arising from the agency, and makes a part of them. It arises ex-contractu, and is not barred by the prescription of three years. C. C. article 3508; 15 An. 143 and 534; 16 An. 397; 17 An. 246. The plea of ratification, I think, should not prevail. True, some nine or ten months intervened between the time of the rendition of the account and the date of the letter of plaintiffs objecting to the account.

It is shown that intercourse between New Orleans and Clarksville was free in May, 1862. That the last named place was in possession of the Federal forces in 1862, and that it was not recaptured by the insurgents. This by no means establishes that there was any direct communication between the places during the whole period embracing the transactions. It appears that the communication was circuitous, being by the way of New York. A state of war existed in a considerable portion of the country through which this communication was had. It is not shown that the communication, such as it was, was safe, reliable and constantly free from suspension and delay. Under ordinary circumstances the plea might have weight, but under those that did exist, I am inclined to think none should be attached to it.

The plaintiff claiming equity should do equity. The first two bills drawn upon the defendant were paid by him before the suspension of specie payments; I think the inference clear that they were paid in specie or bank notes, convertible at that time into gold or silver at the will of the holder. The defendant should not therefore be held to account, so far as those bills are concerned, for any premium. The judgment, I think, erroneous in that respect, and should be reduced. The defendant is not protected by the doctrine announced in Weaver v. Anfou and subsequent decisions. The facts in this case are wholly

different. In Weaver v. Anfou, the defendant was estopped by his haste to show that he had been dealing in an unlawful currency in derogation of law and morals, alleging his own turpitude to avoid his contracts. The check was paid either in Confederate money or in bank notes, and the court presumed the transaction to have been in lawful rather than in unlawful currency. This presumption in favor of the plaintiff in that case would *ceteris paribus* have availed the defendant in this case; but under the evidence it is swept away; for it is distinctly in proof that in the important payment made for his principal to Given, Watt & Co. he discharged the debt in currency, for he compelled his agent's creditor to receive gold with the high premium for it in payment of a debt contracted in 1860.

---

### SAME CASE ON REHEARING.

LUDELING, C. J. The defendant is sued for an account of his agency in selling seventy-four hogsheads of tobacco shipped to him between the twenty-second of March and the first of May, 1861. The tobacco was sold in obedience to. instructions, for coin, and it netted $14,338 49 in gold, which was worth, at that date, and at the period when this suit was brought, $18,794 26 in currency.

The plaintiffs drew several bills against their shipments of tobacco, amounting to $8436 36, which the defendant accepted and paid.

The defendant rendered an account to the plaintiffs to which the plaintiffs urge the following objections :

That the charge of two and one-half per cent. commission for advancing, in addition to eight per cent. interest per annum, is unlawful and usurious.

That the bills drawn by the plaintiffs were paid in currency which was depreciated, and the amount thereof is charged up against the gold proceeds of the tobacco, and that the balance of interest is also charged up against said gold proceeds.

The defendant filed a general denial, and afterwards filed a supplemental answer, pleading the prescription of one and two years to the right of plaintiffs to object to the usurious charges in the account, and the prescription of three years against the demand of plaintiffs, which, it is alleged, is on an unacknowledged or open account.

The plea, as it respects the usurious interest, is without application. The plaintiffs have not paid any usurious interest—they are contesting the defendant's right to apply their money to the payment of unlawful interest claimed by him.

The prescription of three years is equally untenable. The suit is brought upon a contract of agency, and it is barred by ten and not three years. 7 An. 53; 10 R. 487; 15 An. 534; 16 An. 397; 17 An. 246.

Poindexter and Pollard, Appellees, v. John E. King, Appellant.

John E. King having made *advances* to Poindexter & Pollard on the shipments of tobacco to the amount of $8436 36, the latter became the *debtors* of the former for that amount, and King had a privilege on the tobacco to secure the payment of the debt. If the tobacco had been destroyed, it would not be pretended that King could have recovered $8436 36 *in gold* from his debtors—they could have discharged their liability in currency.

If the tobacco had been sold for United States treasury notes, King could have legally retained only $8436 30 out of the proceeds. On what principle then can he be permitted to claim and retain $11,248 48 or *its equivalent*, in payment of the $8436 36 due him?

The shippers had a right to instruct their factor what to sell their property for; they told him they wanted *gold for the balance coming to them*. How could this fact change the rights of the defendant against the plaintiffs?

We cannot perceive why his debt should be paid in gold, if the tobacco were sold for gold, and in currency, if the tobacco were sold for currency. If the defendant had alleged and proved that he had been obliged to pay out gold for the plaintiffs, there might have been some equity in his demand, but such is not the fact. It is admitted that the banks suspended specie payment on the seventeenth day of September, 1861, and it is proved that after that period, the business in New Orleans (when the drafts of the plaintiffs were paid) was mainly carried on in currency. The Hoover drafts, due on the twenty-ninth of January, 1862, amount to $5455; and that they, at least, were paid in a depreciated currency, the evidence in the record leaves no reasonable doubt. It is contended that the plaintiffs are estopped from claiming anything from defendant, because they acquiesced in the account rendered to them by not objecting sooner. This question is not presented by the pleadings. But if it had been it would not have prevented the plaintiffs from showing errors in the account. The effect resulting from an acknowledgment of the account would be to shift the onus of proof. "These accounts are necessarily provisional until settled, and even after settlement, may be rectified by either party on account of errors or omissions, subject to which every settlement is held to be made." 2 An. 27.

The defendant is bound to account to his principals for the balance of the gold receipts. The agent cannot be allowed to enrich himself at the expense of his principal.

It is therefore ordered, adjudged and decreed that the judgment of this court rendered on the thirtieth November, 1868, be avoided and reversed, and that the judgment of the District Court be amended so as to reduce the amount of the judgment of the District Court in favor of the plaintiffs to the sum of two thousand nine hundred and seventy-seven dollars and fifty-four cents, and that the judgment thus amended be affirmed, and that the appellees pay the costs of this appeal.

WYLY, J.   I still adhere to the views expressed in the original decision of this case.

The drafts were drawn on the consignment and paid by the defendant before the issue of the United States currency, and in the absence of proof to the contrary, the presumption is inevitable that they were paid in lawful money, gold or silver, which was then the only legal tender.  I cannot presume—indeed the plaintiffs have not alleged—that the defendant paid their drafts in Confederate notes; parties will not be presumed to have dealt in an unlawful currency when it has neither been alleged nor proved.  If the agent has paid gold on the consignment, and we can presume nothing else, he is entitled to recover the same from his principal, whether the consignment be destroyed or be sold, under the directions of the latter, for United States currency or gold.  It matters not that the tobacco could have been sold on eighth December, 1862, for either gold or United States currency (the latter being then in circulation).  The drafts were drawn in 1861, and they were paid before the act was passed authorizing the issue of United States currency; they could not have been lawfully discharged or paid except in gold or silver.  And the principal was bound to return an equal value to his agent.

The account was rendered by the defendant to the plaintiffs nearly nine months before any objection was made.  In that account he imputed a sufficient amount of the gold proceeds to the payment of the amount of his advances.  The account of sales was in gold, the amount of advances was deducted therefrom, dollar for dollar, in the account. After the lapse of so long a time, without objection, it ceased to be an open account, and became a stated account between the parties.

Now, if plaintiffs seek to go behind that account or settlement, and claim that their factor has been unfaithful; that, instead of paying the drafts which they drew on him in 1861, in gold or silver (the only lawful money), he in fact discharged the same in Confederate notes, of less value, they must allege and prove the infidelity of the agent; they must make out their case; they cannot establish it upon presumptions that are unlawful, and therefore impossible.

If the relation of defendant and plaintiffs be only that of debtor and creditor, and therefore the debt of the latter could have been discharged on eighth December, 1862, in United States currency, dollar for dollar, the defendant could compensate his debt with the gold of plaintiff which happened to be in his hands, dollar for dollar.

For the foregoing reasons and those assigned in the original opinion of this court, I cannot assent to the decision just rendered.